# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Bonita Berg,

        Plaintiff,

v.

United States of America;
The United States Drug Enforcement
Administration; Agent Tammy Key; and an
Unknown Number of Unnamed and
Unknown Agents of the United States
Drug Enforcement Administration in Their
Official and Individual Capacities,

        Defendants.

**ORDER**
Civil No. 03-4642 (MJD/JSM)

---

Albert T. Goins, Sr. and Joanna L. Woolman, Goins & Wood PC; David Y. Trevor, Gillian A. Brennan, and Timothy E. Branson, Dorsey & Whitney, LLP; Jerry W. Blackwell, Blackwell Burke, PA; and Teresa J. Nelson, ACLU of Minnesota for Plaintiff.

R. Joseph Sher, United States Department of Justice; and Patricia Cangemi, Assistant United States Attorney, for Defendants.

---

## I.     INTRODUCTION

This matter is before the Court on Defendants' Renewed Motion for

Summary Judgment [Docket No. 82]. Oral argument was heard on December 1,

2006.

## II.    PARTIES AND PROCEDURAL BACKGROUND

Plaintiff Bonita Berg filed suit against the United States Drug Enforcement Administration ("DEA"), DEA Agent Tammy Key, and others for allegedly violating her constitutional rights in connection with a search performed at the Minneapolis-St. Paul International Airport.

In October 2003, Defendants filed a Motion to Dismiss.  In June 2004, this Court granted in part and denied in part Defendants' Motion to Dismiss.  In September 2006, Defendants filed a Renewed Motion for Summary Judgment on Plaintiff's remaining claims.

## III.    FACTUAL BACKGROUND

In 1999, President Clinton issued an Executive Memorandum on "Fairness in Law Enforcement." (Branson Ex. C.) The Memorandum called for the examination of the use of race, ethnicity, and gender in federal law enforcement. The Department of Justice ("DOJ") selected the Immigration and Naturalization Services and the DEA to implement field tests collecting data on individuals stopped or encountered by law enforcement officers.

Operation Jetway was created to provide standardized training and to collect and analyze arrest and seizure data from federal, state, and local drug interdiction units working at airports, bus stations, train stations and parcel facilities.  The DEA originally selected six Operation Jetway sites for the field test.

2

All DEA agents working at Operation Jetway sites were required to complete a field encounter form for every individual stopped.  DEA agents were required to record demographic data of persons they encountered.  The purpose of collecting this information was to assess whether the DEA was engaged in racial profiling.  Encounters were classified as either "hot-stops" or "cold-stops." Hot-stops are stops supported by a tip that an individual is carrying contraband. Cold-stops are stops based upon an agent's observation and reasonable suspicion. Agents had to complete field encounter forms and list all reasons and indicators for each encounter, whether or not the encounter resulted in a seizure or an arrest.  The data was later entered into a database for statistical analysis.

DEA agents were specifically instructed not to take or record any personal identifying information from the encountered individuals.  On June 1, 2000, the DEA expanded its field encounter data collection to include approximately sixty airports nation-wide.  Minneapolis-St Paul International Airport ("MSP") was included in the expansion, and DEA Agent Tammy Key was assigned to MSP.

The DEA has identified what are generally known as counter-surveillance activities for airports.  (Branson Decl. Ex. O-P.) The DEA manual lists the following as drug courier characteristics: (1) constantly surveying area, (2) aimless wandering in terminal, (3) in/out of bathrooms, (4) disposing of ticket, (5) delaying pick-up of luggage, (6) failing to pick up luggage (returns later

and/or telephones requesting delivery by airlines), (7) pretending to be traveling alone, (8) handing off carry-on bags/baggage claim stubs, and (9) using lockers for carry-on bags.  (<u>Id.</u> at Ex. O at 9-10.) Other factors include being the first or last off the plane, appearing nervous, walking rapidly through the terminal, inappropriate amounts of luggage, new luggage with price tags attached, and traveling to or from a source city.  (<u>Id.</u>)

In 2000, the DEA agents at MSP began using field encounter forms.  At the end of the first year, the field encounter forms indicated that Key made forty-nine cold-stops during the time period.  (Branson Decl. ¶¶ 7-9; Ex. F, F.1.) According to the field encounter forms, Key cold-stopped thirty-six Hispanic individuals, seven African-American individuals, and six white females.  (<u>Id.</u>) Key did not conduct any cold-stops of white male individuals during this period.  (<u>Id.</u>)  None of the individuals had illegal drugs or drug money on their persons.  (<u>Id.</u>) Thus, Key's cold-stop seizure rate was 0%.  (Branson Decl. ¶9, Ex. F, F1; Key Dep. at 105-08.) Based on an August 16, 2001 compilation of National Data, the national cold-stop seizure rate was 12%.  (Branson Decl. Ex. A at 8.)

In 2000, the ethnic population in Minnesota was 89.4% white, 2.9% Hispanic, and 3.5% African American.  (<u>Id</u>. Ex. J.)  The 2000 Census data collected for the Minneapolis-St. Paul Metropolitan Statistical Area reflected a population of 84.7% White, 3.6% Hispanic, and 5.9% African American.  (<u>Id.</u> Ex.

K.)  According to the DEA, illegal drugs in Minnesota are largely controlled by Mexican and African-American traffickers and street gangs.  (Id. Ex. M -- 2001 Minnesota Drug Threat Assessment prepared by the DOJ.)

Agent Key's field encounter forms indicate her reasons for initiating contact with African-Americans as: (1) the type of luggage used or not used by the individual; and (2) traveling from a "source city" such as Los Angeles or Detroit. (Branson Decl. Ex. F.)  More specifically, Key recorded reasons for stopping African American individuals as: (1) flying in from a source city, (2) carrying a medium sized heavy carry-on bag, (3) having no luggage or bags, (4) having very little luggage, (5) having a small carry-on bag, and (6) carrying a computer bag with no other luggage.  (Id.)

## III.    THE ENCOUNTER

The following facts are recited in the light most favorable to Plaintiff Berg. On February 26, 2001, Berg, an African American, was cold-stopped by Key at approximately 6:30 in the morning.  As Berg deplaned, Key's attention was drawn to her.  Key eventually initiated contact with Berg.  Key's field encounter form indicated that the reasons for initiating contact with Berg were because her flight arrived from a source city and the bag she carried looked too heavy for her.  Key, along with Airport Police Officer Toyen, decided to follow Berg.

Key makes no claim that Berg looked around the gate area upon deplaning in any manner that was suspicious or in any manner that would further draw her attention to Berg.  (Branson Decl. Ex. Q.)  Toyen testified that he observed Berg engaging in counter-surveillance activity by looking out of the window; but also stated that Berg's "looking in the window [was] no different than anybody else." (Toyen Dep. at 55-56.) Key does not recall observing Berg looking out of the window as Berg walked through the airport.  (Key Dep. at 117-19.)

Key and Toyen followed Berg as she proceeded to baggage claim, and watched as Berg waited for her checked luggage.  Berg picked up a large, hard-sided suitcase and walked to the elevators.  Toyen testified that Berg did not do anything suspicious at this time.  (Toyen Dep. at 57.) Key and Toyen watched as Berg entered an elevator alone.  (Berg Dep. at 23-24.)  Key and Toyen then ran to catch up with Berg and entered the elevator with her.  (Id. at 23; Berg Aff. ¶ 3.)

Berg got off the elevator at the ground level.  Because of the early morning hour, there "was no one around." (Key Dep. at 131.) When Berg got off, Key and Toyen stopped her.  Key and Toyen displayed their badges and identified themselves as DEA agents.  (Berg Dep. 23-24.) They told Berg that their job was to stop people who brought in drugs and laundered money.  (Id.) Berg asked what their criterion was for stopping her and asked if they stopped her because she was African American.  (Id. at 24-25.)  Key told Berg that the only reason she

6

stopped Berg was that Berg's carry-on bag looked heavy.  (Def. Ex. 3 at 2; Berg

Dep. at 25.)  Berg told Key and Toyen that she knew what police duties were

because her father was a Minneapolis police officer and BCA agent.  (<u>Id.</u> at 40.)

Toyen replied that Berg should then know that he and Key were just doing their

jobs.  (<u>Id.</u>) Berg responded, "I know about what doing your job is." (<u>Id.</u> at 41.)  To

which Toyen replied, "[Do not] be indignant." (<u>Id.</u>)

 Key asked Berg for her driver's license and airline ticket.  (<u>Id.</u>)  Key wrote

down Berg's personal identifying information.  (<u>Id.</u>) When Berg questioned Key

about this, Key said that she needed to write down the information to report back

to her boss what she had done for the day.  (<u>Id.</u> at 42.) In fact, as discussed above,

the DEA field encounter form does not ask for, and DEA agents were specifically

instructed not to request, any identifying information from the individuals they

encountered.

After Berg was told not to be indignant and Key recorded Berg's identifying

information, Key asked to search Berg's carry-on.  (Berg Dep. at 42.) Berg did not

feel free to leave or refuse the search.  (Berg Aff. ¶¶ 6-10.) Berg told Key to "go for

it." (Berg Dep. at 42.)

Toyen testified that the airport maintains a supply of pre-printed consent-

search forms.  The forms advise individuals that they are free to refuse a search

and are free to leave at anytime.  (Toyen Dep. at 93-94.) Toyen admits that Berg was never given such a form.  (Id. at 94.)

Berg's carry-on bag contained only personal items and books.  Neither Key nor Officer Toyen searched Berg's large, hard-sided luggage.  After Key searched Berg's carry-on bag, she and Toyen walked away.

Key testified that Berg's behavior was similar to behavior she observed from a man who was carrying illegal drugs just days before she stopped Berg. (Def. Ex. 3.)  Regarding the previous encounter, Key testified that the man had trouble carrying his bag.  According to Key the bag seemed heavy for the man, and he was walking "stiffed legged" and with a "funny gait." (Def. Ex. 3 at 34, 36; Key Dep. at 101-102.)  Key's attention was drawn to the man, and she approached him, searched his bag, searched his person and found drugs strapped to his legs. (Id.)  Key concluded that the man was having trouble walking because of the drugs strapped to his legs.  Key perceived Berg's behavior to be "identical." (Id.)

Berg alleges that: (1) Key stopped her and searched her bag without reasonable suspicion in violation of the Fourth Amendment;  (2) Key impermissibly used race as a factor to stop her in violation of the Equal Protection clause of the Fifth Amendment; and (3) Key invaded her reasonable expectation of privacy under Minnesota State tort law.

8

Defendants seek summary judgment on all Berg's claims.  Defendants argue that Berg consented to the search and therefore the Fourth Amendment was not implicated; that Berg is unable to meet her burden of proof regarding her Equal Protection claim; that Key is shielded by qualified immunity; and that Berg's consent to the stop and search precludes any tort claim of intrusion upon seclusion.

## IV.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Id. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.  Plaintiff's Fourth Amendment Claim

Under the Fourth Amendment, warrantless searches are presumptively unreasonable and permissible only when officers have reasonable, articulable suspicion or when officers obtain the "knowing and voluntary consent of the

9

person subject to the search." United States v. Escobar, 389 F.3d 781, 784 (8th Cir. 2004) (quoting United States v. Brown, 763 F.2d 984, 987 (8th Cir. 1985)). A seizure occurs when an officer, "by means of physical force or show of authority" has in some way restrained the movement of a citizen. United States v. Mendenhall, 446 U.S. 544, 553 (1980).

"[A] temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in Terry v. Ohio, . . . and is permissible because of the 'public interest involved in the suppression of illegal transactions in drugs or of any other serious crime.'" Florida v. Rodriguez, 469 U.S. 1, 5 (1984) (citations omitted).

Defendants argue that they are entitled to summary judgment on two grounds: (1) Berg consented to the search of her luggage; and (2) even if Berg did not consent to the search, Key had the right to approach Berg, ask questions and search Berg's luggage because she had reasonable suspicion under Terry.

### 1. <u>Whether Berg Consented To Key's Search</u>

A decision to "cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant only if the cooperation is voluntary." Florida v. Bostick, 501 U.S. 429, 438 (1991) (emphasis omitted). Consent is assessed by the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). If a "reasonable person would have

10

believed [she] was not free to leave," a seizure occurred and the officers went beyond the bounds of a consensual, investigative stop.  Florida v. Royer, 460 U.S. 491, 501 (1983).

In determining whether an encounter was consensual, the issue is whether police questioning at the scene was "so intimidating, threatening or coercive that a reasonable person would not have believed [herself] free to leave."  United States v. Garcia, 197 F.3d 1223, 1226 (8th Cir. 1999) (quotation omitted). Although courts may consider whether officers told a citizen that she was the focus of a drug investigation, such a disclosure, standing alone, does not have "independent significance" that turns a consensual encounter into a seizure.  See United States v. Dixon, 51 F.3d 1376, 1380 (8th Cir. 1995).

Courts must consider the environment where the alleged consent occurred. The factors taken into consideration are the officer's use of language and tone of voice, the place where the questioning occurred, and whether the consent occurred in a public or secluded place.  Mendenhall, 446 U.S. at 554.  A coercive environment is more likely to occur in a secluded area.  Escobar, 389 F.3d at 787. Another factor to consider is the manner in which officers speak to detained citizens.  See United States v. Drayton, 536 U.S. 194, 195 (2002) (finding search constitutional because, inter alia, officer spoke to bus passengers in a "polite and quiet voice").  Under certain circumstances, telling an officer to "go ahead" with a

search is not voluntary consent to the search.  <u>United States v. Morgan</u>, 270 F.3d

625, 631 (8th Cir. 2001) (finding that consent was not voluntary when defendant

said, "Go ahead" after officer told defendant that he would walk his dog around

the van if she did not consent to search); <u>Escobar</u>, 389 F.3d at 786.  Moreover,

under a totality analysis, the Supreme Court "has rejected . . . the suggestion that

police officers must always inform citizens of their right to refuse when seeking

permission to conduct a warrantless consent search." <u>Drayton</u>, 536 U.S. at 206

(citing <u>Ohio v. Robinette</u>, 519 U.S. 33, 39-40 (1996)).  Rather, this is just one

factor to consider when analyzing the totality of the circumstances.   <u>Id.</u> at 207.

However, "absence of such notice may imply that the detainee was being

restrained." <u>Escobar</u>, 389 F.3d at 786.   In general, officers can ask for

identification, even if there is no basis to suspect the individual of breaking the

law. <u>Muehler v. Mena</u>, 544 U.S. 93, 101 (2005).

Fact questions remain as to whether Berg voluntarily consented to the

search.  Key and Toyen stopped Berg in an area that was secluded due to the time

of day.  Key's attention was first drawn to Berg while she deplaned.  However,

Key then followed Berg through the airport to baggage claim.  Key could have

stopped Berg before she was in a secluded location where Berg would be

outnumbered two to one.  This fact, when coupled with the fact that Key and

Toyen ran to get into the elevator with Berg, may be enough for a reasonable

juror to doubt that Berg voluntary consented to be searched, and was instead coerced into submitting to a search because she felt she was not free to leave.

Moreover, Toyen demanded that Berg not become "indignant." The manner in which Toyen spoke to Berg, when viewed in a light most favorable to Berg, does not support Defendants' argument that Berg voluntarily consented to be searched. A reasonable juror could find that Toyen's statement created an environment wherein a reasonable person would not feel free to leave and wherein she must submit to the authority of the officer or suffer the consequences, especially in light of the fact that neither Key nor Toyen told Berg that she was free to leave. See Escobar, 389 F.3d at 786 (finding that under a totality analysis, failure to inform citizens that they were free to refuse consent was one factor supporting a finding that the search was not voluntary). A reasonable juror could find that Berg's invitation to "go for it" was not a clear declaration of consent under these circumstances, but rather submission in the face of no other alternative.

In addition, when Berg asked why she was being stopped, she was told that Key's and Toyen's job was to stop people who brought in drugs and laundered money. Although this statement, standing alone, did not create a seizure situation, when considered along with all the other evidence, including the fact

13

that Key wrote down Berg's personal information, a reasonable juror could find that Berg was not free to refuse consent to Key's requests.

A fact question remains as to whether Berg voluntarily consented to Key's search of her luggage, and therefore summary judgment is denied on this basis.

### 2. <u>Whether Key's Actions Were Supported By Reasonable Suspicion</u>

Berg's stop is subject to review under the standards set forth in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Under <u>Terry</u>, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>United States v. Cornelius</u>, 391 F.3d 965, 967 (8th Cir. 2004) (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000)). A <u>Terry</u> stop withstands Fourth Amendment scrutiny because it is based upon a reasonable suspicion that a person has or is about to commit a crime. <u>Terry</u>, 392 U.S. at 21-22.

Reasonable articulable suspicion is more than a hunch. <u>United States v. Pena-Saiz</u>, 161 F.3d 1175, 1177 (8th Cir. 1998) (citing <u>Terry</u>, 392 U.S. at 27). "In the absence of any basis for suspecting [an individual] of misconduct, the balance between the public interest and the [individual's] right to personal security and privacy tilts in favor of freedom from police interference." <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979). Reasonable suspicion is determined on the totality of the circumstances. <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).

14

Fact questions remain as to whether Key's actions were supported by reasonable suspicion.

Key testified that she stopped Berg because Berg's bag looked too heavy. (Def. Ex. 3.)  The DEA manual does not list having a heavy bag as a characteristic of a drug courier.  A fact question remains as to whether Berg's behavior and demeanor gave Key and Toyen reasonable suspicion that Berg was engaged in criminal activity.  If Key's criterion was whether an individual arrived from a source city carrying heavy luggage, many individuals would have been stopped on February 26, 2001.

Key further asserts that Berg's behavior was similar to that of a drug currier she had observed "walking stiffed legged."  Key argues that this similarity gave her reasonable suspicion to stop Berg.  However, there is nothing in the facts indicating that Key's attention was drawn to Berg because she was walking with stiff legs.  Key did not even search Berg's person.  Key is unable to point to any reasonable articulable rationale that amounts to more than a hunch for initiating contact with Berg and searching Berg's carry-on bag.

Moreover, Toyen admitted that when Berg was looking out the windows, she was not doing anything unusual.  Thus, this behavior did not provide reasonable articulable suspicion to search Berg's bag.

15

Accordingly, fact questions remain as to whether Key had reasonable articulable suspicion to stop and search Berg.  Thus, summary judgment is also denied on this basis.

C.  **Berg's Fifth Amendment Equal Protection Claim**

To succeed on her equal protection claim, Berg must prove that Key exercised her discretion to stop and search Berg's luggage because of Berg's race, which requires proof of both discriminatory effect and discriminatory purpose. Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003).  As the non-moving party to the motion for summary judgment, Berg must "identify affirmative evidence from which a jury could find that [she] has carried . . . her burden of proving the pertinent motive." Id. (citing Crawford-El v. Britton, 523 U.S. 574, 600 (1998)). To succeed on her Fifth Amendment claim, Berg must demonstrate that Key intentionally discriminated against her on the basis of her race.  See Central Airlines, Inc. v. United States, 138 F.3d 333, 334-35 (8th Cir. 1998).

The Supreme Court has approved the use of statistical evidence to help prove discrimination.  See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307 (1977).  In support of her claims, Berg proffers Key's field encounter forms and census information for Minnesota and the Minneapolis-St. Paul Metropolitan Area.

16

Defendants first argue that Berg is unable to proffer her statistical evidence because she does not have a qualified expert to explain the method and the validity of the statistical analysis.  Defendants also assert that Counsel Branson's declaration is inadmissible because it fails to meet the personal knowledge requirement of Fed. R. Civ. P. 56(e).

While Defendants correctly cite the rule, they are misapplying the rule to the facts of this case.  Berg's Counsel does not seek to vouch for the quality of the statistics, but merely offers Key's cold-stop field encounter forms as raw evidence. At her deposition, Key authenticated sixty of the sixty-one field encounter forms. In addition, Berg is not making any representations as to the statistical significance or merits of the figures in the field encounter forms.  As Berg's Counsel represented at the hearing, all he is doing is "math" – adding up the totals from authenticated documents.

Defendants argue that the only true expert statistical evidence in this case is the opinion of their expert who opined that the raw figures have no statistical significance because there is no base against which to measure them.  Looking at the facts in the light most favorable to Berg, the raw numbers indicating that Berg cold-stopped minorities at a much higher rate than whites, in combination with Key's lack of clearly articulable reasons for the stop, create a fact issue as to whether Key used race as an impermissible factor when choosing to stop Berg.  It

17

will be for the jury to decide whether Berg's lack of expert evidence is ultimately
fatal to her claims.

The same is true for Berg's census data.  Berg proffers census data from
Minnesota and from the Metropolitan area to show the disparity between the
percentage of minority persons in the population as a whole as compared to the
percentage of minority persons Key cold-stopped.  This data is admissible, but the
value of it will be judged by the jury at trial.

Regarding the merits of Berg's Fifth Amendment claim, the Court finds that
fact questions remain as to whether Key used race as a basis for stopping Berg.
The Court has already concluded that a reasonable juror could find that Berg did
not have reasonable articulable suspicion to stop Berg based on Berg's actions.
This, coupled with the fact that Key's cold-stops were overwhelmingly minority
persons, could lead a reasonable juror to conclude that Berg used race as a reason
to stop Berg.  Common sense suggests that the "no bags," "little bags," "computer
bags," "heavy bags," and other innocuous criteria upon which Key based her
suspicions must apply equally to people of all races who deplane from source
cities.  Thus, a question remains as to why Key's cold-stops were overwhelmingly
minority persons, and particularly why Key stopped Berg.  Stopping someone on
the basis of race has a discriminatory purpose and a discriminatory effect.
Looking at the facts in the light most favorable to Berg, she has met her burden to

identify evidence from which a jury could find that Key's actions were based on a discriminatory motive.

A fact question remains as to whether Key's actions were motivated by a discriminatory purpose and as to whether the DEA engages in a custom, policy and practice of racial profiling. Thus, summary judgment is denied on Berg's Fifth Amendment claim.

### D.   Berg's Intrusion Upon Seclusion Claim

Under Minnesota law, the tort of intrusion upon seclusion has three elements: (1) an intrusion, (2) regarded as highly offensive, (3) into some matter in which a person has a legitimate expectation of privacy. Swarthout v. Mutual Serv. Life Ins. Co., 632 N.W.2d 741, 744 (Minn. Ct. App. 2001).

Defendants argue that there was no intrusion because Berg's stop was based upon reasonable suspicion and Berg consented to the search. However, as discussed above, fact questions remain as to whether Berg's Fourth Amendment rights were violated. Berg's intrusion upon seclusion claim is dependent upon her Fourth Amendment claim. If Berg is able to prove that there was a violation of her Fourth Amendment rights, then the intrusion element would be established because she will have established a violation of her legitimate expectation of privacy in her luggage. Moreover, it is axiomatic that any constitutional violation is highly offensive. Thus, if an intrusion is established, that intrusion was highly

offensive and a violation of Berg's legitimate expectation of privacy.  The same

fact questions apply to both Berg's Fourth Amendment claim and her tort claim.

Summary judgment is therefore denied on this claim also.

Notwithstanding the above, Defendants asserted for the first time in their

reply brief that Berg is not entitled to submit her tort claim to a jury because

claims brought under the Federal Tort Claims Act must be tried to the Court not a

jury.  (Def. Reply Br. at 10-14.)  This assertion is correct, and Berg does not seem

to contest it.  See 28 U.S.C. §§ 2402; United States v. Neustadt, 336 U.S. 696, 701

n.10 (1961).  However, that does not preclude a denial of summary judgment.  It

only means that the Court should bifurcate the case at trial and that the Court,

rather than the jury, will decide the tort claims.  Thus, this is not an impediment

to the denial of summary judgment.  Since fact questions remain as to Berg's tort

claim, Defendants' motion is denied as to this claim.

### E.    Plaintiff's Claim for Declarative Relief

Plaintiff has abandoned her claim for injunctive relief.  (Pl. Mem. Opp. Mot.

Summ. J. at 2 n.1.)  Defendants now assert that Plaintiff must also abandon her

claim for declaratory relief since she has not demonstrated a continuing case or

controversy justifying prospective relief.  This argument is misplaced.  A threat of

future harm is required to maintain an action for injunctive relief.  See Forest Park

II v. Hadley, 336 F.3d 724, 731 (8th Cir. 2003).  On the other hand, a claim for

declaratory relief does not require a threat of future harm.  28 U.S.C. § 2201 ("In

a case of actual controversy . . . . any court in the United States . . . may declare

the rights and other legal remedies of any interested party seeking such a

declaration, whether or not further relief could be sought"); Fed. R. Civ. P. 57.

Berg has stated a controversy with Defendants, and thus may seek a declaration

that her rights were violated.

### F.   Key's Qualified Immunity Defense

"The purpose of qualified immunity is to allow public officers to carry out

their duties as they believe are correct and consistent with good public policy,

rather than acting out of fear for their own personal financial well being."  Sparr

v. Ward, 306 F.3d 589, 593 (8th Cir. 2002).  When a government official is sued

for a discretionary act, the official is protected from liability "unless a reasonable

person in [her] position would have known his actions violated clearly established

law."  Id.  (citation omitted).

In evaluating a motion for summary judgment on qualified immunity

grounds, the Court will examine the claim under a two-step analysis.  "First,

courts must consider whether, taken in the light most favorable to the party

asserting the injury, the facts alleged show the officer's conduct violated a

constitutional right."  Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)  (quotation

omitted).  "[I]f a constitutional right may have been violated, the second step

requires courts to ask whether the right was clearly established. This is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. (quotations omitted). "To demonstrate the law is clearly established, the plaintiff must show a reasonable official would understand that what [she] is doing violates plaintiff's rights." Sparr, 306 F.3d at 593 (quotation omitted). Where there "is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999).

### 1. Whether Berg's Facts Show That Key Violated a Constitutional Right

As discussed above, looking at the facts in the light most favorable to Berg, Berg has demonstrated that Key violated her Fourth and Fifth Amendment rights. At the very least, Berg has created a genuine dispute concerning these predicate facts. Thus, this part of the analysis is satisfied.

### 2. Whether the Rights Were Clearly Established

Berg had a clearly established right of privacy in her carry-on bag. Bond v. United States, 529 U.S. 334, 336-37 (2000) (quoting United States v. Place, 462 U.S. 696, 707(1983)); United States v. Gwinn, 191 F.3d 874, 878 (8th Cir. 1999). Berg also had a clearly established right to be free from being stopped solely on

the basis of her race.  Whren v. United States, 517 U.S. 806, 813 (1996) (reasoning that "the Constitution prohibits selective enforcement of the law based on considerations such as race"); United States v. Frazier, 408 F.3d 1102, 1108 (8th Cir. 2005) (opining that "encounters with officers may violate the Equal Protection Clause when initiated solely based on racial considerations").  Notwithstanding this, Defendants argue that a reasonable officer in the same circumstance as Key would have acted in the same manner.

Given the facts of the case and Key's purported reason for stopping Berg, Defendants' argument is without merit.  When asked why she stopped Berg, Key testified that "[Berg's] carry-on bag looked too heavy" for her.  Whether or not someone has a bag that appears too heavy is not listed in the DEA manual as a characteristic of a drug courier.  Moreover, Key testified that her attention was drawn to Berg and her carry-on bag due to a previous experience Key had with a passenger who turned out to be in possession of illegal drugs.  However, as discussed above, this situation was clearly distinguishable from Berg's situation.  Thus, Key is unable to point to an articulable reasonable suspicion for initiating contact with Berg and searching Berg's carry-on bag.  Moreover, Key is unable to demonstrate that Berg consented to be searched.  A reasonable DEA agent would know that she must either receive consent or have reasonable articulable suspicion to stop someone and search her bag.

In addition, a reasonable DEA agent would know that running down someone in the airport so that two DEA agents could ride the elevator with the lone citizen and question the citizen in an isolated part of the airport in the pre-dawn hours of a winter's morning created a coercive environment indicating that any consent was not voluntary.  Furthermore, because DEA Agents were not allowed to record identifying information, Key exceeded the boundaries of her discretionary role by recording Berg's identifying information.  This is also something a reasonable DEA agent would view as a violation of a person's rights.

Therefore, it is unlikely that an officer in the same circumstance would have felt that an individual carrying a bag that appeared too heavy would have stopped the individual, since "heavy bag" is not a criterion for stopping someone. Furthermore, since a reasonable officer would not consider looking out the windows in a manner that is no different from any other passenger suspicious, a reasonable officer would not have stopped Berg on this basis either.  Lastly, the fact that Berg arrived from a source city cannot provide a basis for stopping in the light of the dearth of other credible evidence.  Thus, Key's qualified immunity defense fails as to Key's Fourth and Fifth Amendment claims.  See Bond, 529 U.S. at 336-37; Whren, 517 U.S. at 116.  This part of Defendants' motion is denied. Key will be a defendant at trial.

**IV.   CONCLUSION**

24

Fact questions remain as to Berg's Fourth Amendment claim, Fifth Amendment Equal Protection claim, and Minnesota State tort law claim.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** Defendants' Renewed Motion for Summary Judgment [Doc. No. 82] is **DENIED**.

Dated:  February 2, 2007

S / Michael J. Davis
Michael J. Davis
United States District Court